I'll take care of that. Thank you. Thank you. Ms. Williams? Yes, Your Honor. Good morning, Your Honor. Good morning. Marisa Williams on behalf of Patricia Foley-Hinnen. We are both from Denver and we are very excited to be here today because Ms. Foley-Hinnen filed her EEO complaint more than 14 years ago against the GAO. This is the first time she's actually had an attorney able to speak with judges about her case. Is this kind of 14-year period aberrational or common for this particular board or personnel appeals board or is it 14 years? I believe that this is a little bit aberrational but for GAO, I'm not sure that it's really that much out of the norm. What I can say because I represent federal employees in executive agencies where we have the EEOC and the MSPB, it would not take 14 years to get to this point. It simply wouldn't. Part of the problem with this process all along has been GAO has been essentially the fox guarding the hen house. At every single stage of her complaint, GAO has had ultimate control over whether she got to pursue her complaint, how long it would take to get it investigated, and how long until she'd finally get heard by a court. That is unusual. We are thrilled to be here. We are thrilled to be presenting her arguments to somebody for at least for the first time is outside the GAO. I would note in this regard that the personnel appeals board is supposed to be independent but the fact of the matter is those judges are also appointed by the comptroller general. The very people who were involved in the discrimination issues underlying this case. Let me cut to the court. You realize under McDonnell Douglas, you have to establish a causal connection between the protected activity and the adverse action. In this place, the event cited in the appeal took place after the decision to transfer Ms. Foley-Hannon to the ASM. How do you deal with that? In fact, Your Honor, they didn't all take place after. Some of them were before. GAO consistently relies on the statement. There was some disagreement at the PAB, the personnel appeals board. It split two-two on this fact. Two of the judges found that the definitive date for the reassignment was October of 2001 whereas the other two felt it was April of 2001. Already we have a divide there. Assume that April was preliminary. The Supreme Court has said in Clark County that employers need not suspend previously planned transfers upon discovering a Title VII suit has been filed and their proceedings along the lines previously contemplated, although not yet definitely determined, is no evidence whatsoever of causality. First of all, Your Honor, I would respectfully note, I don't think that was the actual holding. I think that was more along the lines of dictum because the issue in that case was the complainant, the plaintiff, only had proximity in time. She had nothing else to support a finding or an inference of retaliation. That isn't the case here because Ms. Foley-Hannon had not only the nexus in time, but she also had proof. She had contradicted all of the reasons that the agency kept coming up with to explain away what they did to her. That is distinctly different than Breeden. That was not the holding of Breeden. That was simply an aside that wasn't necessarily material to the case. However, there was conduct that protected activity before April. In fact, I have pointed that out for you in our reply brief, taking it back to the sworn testimony. Denver was a very small office. There were only 70 employees in that office. In 2000, two of Mrs. Foley-Hannon's coworkers, women, had alleged sex discrimination. That's what they had filed, and she was a witness in their cases. Was she a witness or was she a potential witness? She was, in fact, a witness. She testified. She testified to the EEOC investigators. She testified in one deposition. She spoke to the attorneys in both cases multiple times, and she also spoke to the GAO attorneys before the hearing that ultimately was held in Davis. She actually flew here for that. It doesn't matter for purposes of statute whether or not she finally testified at a hearing. The fact that she spoke up and expressed her concerns about her supervisors meant that she was entitled to protection under the statute. You don't have to follow through. You don't even have to file your own claim. If you oppose illegal discrimination at any point in time, you are entitled to the protection of the statute. So, Your Honor, she did have activity immediately before, even if you want to assume the April date is binding, and that's when Mr. Brew made his decision. She had activity leading up to that, and Mr. Brew knew about it. Although he claimed in his deposition some 10 years later he had no idea about these cases or her involvement, I've produced for you a copy of an email that copied him saying she was a witness in those cases. And let's remember that would be, let me find that real quickly, I think, Your Honor. I'll come up here and I'll continue to speak. So we have to remember that there were only 70 employees and Mr. Brew had been in charge of that office until 97, and then he let Mr. Solomon take over. And Mr. Solomon was, in fact, the person who was specifically named in both women's cases. But Mr. Brew was also implicated. Whether or not they named him, that's a different issue. I'm not sure I can find that email. If it's going to take too much out of your time, you can do it on reply. I will do that, Your Honor. I'll make a note of that. This record is voluminous because it's been going on for so long. So we have the protected activity. We've shown two different adverse actions, the first one being the reassignment to the ASN group working for the same people that had previously subjected her to a hostile work environment. And that is retaliatory in and of itself. The second retaliatory action was the denial of the detail. When she said repeatedly, I can't go to work for these people. I can't do it. Not only did they create a hostile work environment, but I am morally opposed to weapons work. And you have known that for my entire 20-year career with this agency. For them to put her in the one group that she said she could not work for simply smacks of retaliation. So there are two distinct actions there. They could have fixed this at any point in time. If they truly only could put her into ASN, why not let her go in there and do environmental work? Why not let her do some special assignment? Why not have her report to someone back here? That happens all the time. Paid details are an excellent way to allow employees to work outside their specific work group. They wouldn't do that either. My recollection is that she offered to work for free without pay, rather than work on weapons work. That shows the extent to how severely she felt that she could not work in ASN. But that does not change the fact that as a federal employee, she could have had a paid detail. And she even arranged it. They told her all these things she had to do to get the detail. Then at the last minute they said, you've got to get it paid. She said, okay, I'll get it paid. And she did. And they still wouldn't let her do it. If she had been allowed to keep... Isn't there evidence to support the proposition that GAO, thinking of itself as more legislative than executive, basically doesn't do these, what's the term? Details. The details to the executive branch because it doesn't want to mix up clients or investigative subjects with its own personnel. I agree that at some point Mr. Dodaro and Mr. Walker articulated that concern. But there was never anything in writing saying that was a concern. And if it truly were a concern, they wouldn't hire people who came from other branches because they might have worked on something that could be implicated by GAO. I mean, that's easily remedied. I doubt the sincerity of it, but the inescapable fact is they did not articulate this policy until they were talking about Ms. Patricia Foley Hinnant, until they made the very decision to create this policy. But am I remembering right that you, just correct me, that you don't have evidence that with possibly one exception they just haven't done this on other occasions either? We don't have any evidence one way or the other because Mr. Brew, the discriminating official, was the one in charge of providing the evidence in response to discovery. So if you look at, I think, tell me if I'm wrong, the email you're referring to is at appendix 1310. If that's the right email, can you say what you wanted to say about it? Okay. Yes, Your Honor. Is that the one you were referring to? Yes. Mr. Brew was copied on that one. That is the one. Thank you. Yes. What did you want to tell us about that? I'm sorry. Oh, just that this proves that Mr. Brew knew for a fact that these cases with Ms. Davis and Ms. Vargas were going on already. The cases were filed in 2000, and yet he came forward and said, oh, I had no idea that these cases were going on or that Ms. Bullohannon was involved in them. But she is named right under him as one of the people who's going to be called. So I just, his reason was pretext. You know, he did have that knowledge. His claim that he didn't have any knowledge is wrong. This is at least one. Is that everybody in the office? No, no, it is not, Your Honor. You said there, how many people? There's a total of 70 people in the den. Seven, zero. Yes. And can I just ask on this email? Is there, I'm not able to read it fast enough. Is there something here that indicates that she's going to come and testify for the complainant as opposed to maybe for the government? I use government here as a shorthand. I don't want to mix up branches. No, and I appreciate that. I think part of the problem was for even as fully hidden, it was hard for her to know whose side she was being called on. What says notification to GAO's witnesses? However, Your Honor, GAO witnesses could mean, and I suspect it does that they, GAO is obliged to produce everybody who is an employee. Right. But if, if, if this email is crucial to the inference that Mr. Broom knew that she was in some way supporting a discrimination claim, don't you have to find some indication in this email that on the assumption he read it, he would take that away from it? This isn't the linchpin, Your Honor. This was just to rebut his claim that he didn't even know these cases were going on or that she was even a witness. She had been given statements for two years prior to this to support both women specifically attacked. Your, your, your argument that this was to witnesses for both sides seems to be, uh, rebutted by the paragraph that begins because petitioners council will present petitioners witnesses first. I do not yet know the specific time or date of your testimony. But Your Honor, that is still consistent because if Ms. Foley-Hannon was called by the petitioner, he's just saying he can't predict when she's going to testify. All I know for sure is in the EEOC process, if Department of Energy is the defending party, it is obliged to produce every employee, whether it's for the plaintiff or the defendant, they are obliged to produce them. In any event, the very day that she went for the hearing, she said, I am going to, I'm going to sink my career if I testify. And she told that to the EEO manager and Jesse Hoskins who worked with Mr.  She told them sobbing. Okay. Thank you, Your Honor. She sobbed in their offices that day saying, I don't have anything good to say about them. This is going to ruin my career. Please don't make me testify. That's what happened. And this is how she was treated for it. I would like to reserve the amount of time I have left, Your Honor. Thank you. Mr. Schroth. Schroth. May it please the court. Summary judgment in GAO's favor should be affirmed because no reasonable fact finder could conclude that GAO retaliated against Ms. Foley-Hinnon when it assigned her to the ASM team and when it permitted her to go and work at the State Department, but asked her to use the mechanism of leave without pay in a direct appointment through the State Department rather than detailing her there as a legislative branch GAO employee working at an agency that GAO would ultimately audit. Now, the first thing I want to address relates to the assignment to ASM. When she was in that circumstance, then the State Department would become the paying entity? Well, it would depend on the type of detail, but what would not change would be that GAO would have one of its own employees serving in the person's capacity as a GAO employee working in an executive branch agency that GAO would do audit work on or potentially could do audit work on in the future. And when you really look back and? But you're not answering my question. I'm sorry, what did I answer? Would it be paid or unpaid? It would depend on the type of detail. The detail themselves, well, it's not a question of being paid. It's a question of being paid by whom? That was my question. A reimbursable detail would mean that GAO would continue to pay her salary, but would be reimbursed by the State Department. An unreimbursable detail would mean that GAO would be out of pocket. But regardless of who's going to pay, none of that addresses the conflict of interest concern, which was what drove GAO's decision. No, but it addresses my question. Okay. Thank you. Turning back briefly to the question of Mr. Brew, the assignment to ASM, what that claim really is driven by is, what did Mr. Brew know about Ms. Fullyhannon's protected activity and when did he know it? And opposing counsel has claimed that Mr. Brew has known all along about the participation in the Vargas and the Davis cases. But Ms. Fullyhannon herself wasn't involved in the Vargas case until May of 2001. So she wasn't even involved in that case until over a month after Mr. Brew had indicated to her that she was being placed in ASM. And as Ms. Fullyhannon has stated, in her own petition before the Personnel Appeals Board, he told her in April of 2001 that that decision was firm. So as of April 2001, by Ms. Fullyhannon's own admission, it was not a preliminary decision. It was a decision that was already made, but wouldn't be realized for some time because Ms. Fullyhannon had to complete the work on the engagement that she was working on at the time. As I understand your opposing counsel's argument regarding that email, it seems to me that it indicates that he was testifying falsely when he, years later, said he didn't even know she was involved in the cases. Well, I certainly am not aware of any testimony where he stated that in April of 2001, he never knew at any time. My understanding of his testimony is that when I was making these decisions, no, I didn't know about them. Where is that in the record? I'm afraid I can't give you a direct cite to it. I can look for it after and provide it to the court. But what's clear is that when Mr. Brute, Mr. Brute couldn't have known about the Vargas case in April when he was making that decision. Now, the only evidence that she has given, that the opposing counsel has given the court that he knew about the Davis cases, is the email about Vargas. There's no comparable email about the Davis case. And Mr. Brute has, at all times, said that he had no knowledge of Ms. Foley-Hennan's participation in that case. And I'll note that that case has absolutely nothing to do with Mr. Brute. His name is not mentioned anywhere in the petitions that were filed in that case or in the personnel appeals board decision in that case, in which his name is never mentioned and which is part of the record. Now, the other type of protected activity that Ms. Foley-Hennan engaged in was she made various informal complaints about a hostile environment in the predecessor to the ASM team, which was called the Defense Acquisitions Group. And she began making these assertions in the early 90s when Mr. Brute was still a member of the Denver office. And what Ms. Foley-Hennan has testified is that every time she had a conversation with Mr. Brute, she would bring those same concerns up over and over again. What else is undisputed in the record is that Mr. Brute left the Denver office in 1997, moved to GAO headquarters in a completely different capacity, and then in 2001, he's making a determination on where to place Ms. Foley-Hennan when GAO has been totally reorganized and the DA group, Defense Acquisitions Group, no longer exists. And we have a new organizational team with new senior executives called the ASM team. And what's very important is that in 1997, right before Mr. Brute left the Denver office and when Ms. Foley-Hennan's complaints about these informal complaints were fresh, he took her out of the DA group and let her do international work. And what Ms. Foley-Hennan would have the court believe is that Mr. Brute would be the same actor who took her out of what she claimed to be a retaliatory hostile environment in 1997, waited four and a half years when he rarely had opportunity to speak or interact with Ms. Foley-Hennan, where there is not one shred of evidence that Ms. Foley-Hennan had any conversation with him in the few months leading up to that April placement decision, and then would suddenly decide, well, now I'm going to retaliate against you based solely on my knowledge of these stale conversations about a retaliatory hostile environment that I took you out of to begin with. And that is the same actor presumption, that even at the summary judgment stage, when, for example, the same actor hires and then later fires a person and that person has some sort of protected characteristic, there's a strong presumption of no discrimination. Now, another point that I would like to get to relates to the detail claim. And when you really sit back and look at what was happening here, it's clear that what GAO was doing was assisting and going out of its way to assist Ms. Foley-Hennan, not retaliate against her. I have to give credit to opposing counsel in Ms. Foley-Hennan because they have presented this all along as if there is some kind of freestanding right for federal employees who don't like the work that they're doing at their own agency to be able to simply move on to another federal agency while maintaining their own job at the other agency under the aegis of a detail. And what happened here was that Ms. Foley-Hennan came to GAO and said that she didn't want to do this work in ASM and let her go and, as a GAO employee, work in an executive branch agency, even though there's a conflict of interest there. And if GAO were truly motivated to retaliate, it could have said no. That would have ended it. That would be the simple response if GAO wanted to retaliate against her, but that's not what GAO did. David Walker, the Comptroller General, Gene Dodaro, who is now the Comptroller General, and the Executive Committee went out of their way to try to accommodate Ms. Foley-Hennan. They came up with the idea of, well, you know what? We have this concern about having our employees serve in details to executive branch agencies. So to mitigate against that concern, we will let you take leave without pay. We'll let you go and work as a temporary direct appointee of the State Department, and then when the year is over, come back off of leave without pay and you can continue with your job at GAO. This is unquestionably an act of assistance. That's why I asked that question at the beginning. I had an impression that leave without pay meant she wasn't being paid. She wasn't being paid by GAO, and that was the distinction from GAO. But she was being paid by the State. At the same level that she was making at GAO. Another thing that opposing counsel stated about the detail that I think must be corrected is that she testified that she never articulated the reasons for why it didn't want a detail at the executive branch, something that was somehow manufactured 10 years later. And the fact of the matter is that on January 7th of 2002, within several days of the first communication of the denial of the detail, Mr. Walker sent Ms. Foley-Hennan an email that specifically referenced that. And you can find that in the record in the appendix pages 1027 and 1028. And in particular, it's the very last line on page 1028, where he specifically references the fact that by having you not take a detail, this would allow you to be there and not have a GAO employee working in an executive branch in a GAO capacity. So he clearly articulated that at the time, and he's never come off of that. In fact, he testified very clearly that during his tenure as Comptroller General of the United States, he never authorized anyone to go and do an executive branch detail. And Mr. Dodaro confirmed that to his knowledge. No, no one had ever done that. Now, another, and I apologize for jumping back to another claim, but as to the assignment claim, there's one other issue that I wanted to raise, and that relates to the issue of being assigned to doing military work as opposed to civilian work. And why couldn't GAO just accommodate her in that regard? And first, what Mr. Brew has explained was that he had to make a determination based on what GAO's organizational needs were. This wasn't simply a process whereby if there's space in a team and an employee wants to be in that team, that GAO is going to accommodate that preference. What's undisputed is that organizational needs came first, and employees' skills and abilities was the second thing that he considered. And lastly, if he could accommodate it, he would look at the preferences. And it's undisputed that the ASM team needed staff. And as Ms. Foy-Hannon has admitted, that she was told that there was no civilian work at the time available to her to perform. That's GAO's legitimate non-discriminatory reason, and they never produced a shred of evidence undercutting that there actually was other work that she could have done at the time. And I'd further add that GAO work is not something where you go when you're doing one type of work and that work is static the entire time in your career. If you're in the ASM team, you're going to be working under a broad umbrella of different types of work. And there might be different types of work that come up at different times. But what is undisputed in the record is that at the time that she was joining ASM, that's the kind of work that GAO had available to her. And Ms. Foy-Hannon continued to oppose and try to do different kinds of work. And she was told at every step of the way that, look, there's another preference survey coming up. If you need to, you can change teams. This is, you know, we're talking at most a year, and if you don't appreciate this, then certainly you'll have an opportunity to change that down the road. This was not a life sentence of military work. And, in fact, Ms. Foy-Hannon did pursue other types of work, and GAO ultimately accommodated that request by permitting her to go and work at the State Department. Can I just ask you, can you explain just how long this took to get to us? Certainly, certainly. And the first thing I'll point out is that at the PAB level, once the case was filed as a petition at the Personnel Appeals Board, went through discovery, and there was a lengthy period of discovery and there was a lengthy period of time because there were a large number of claims. The number of claims that are here on appeal are far smaller than the number of claims that were initially raised. But once it was at the lawsuit stage, things proceeded at what I would describe as a usual pace at the Personnel Appeals Board. Well, usual is not entirely correct. And certainly, I believe the petition was filed in 2011, and by 2013, I believe, was when the initial decision was issued. So that's not an unusually lengthy period of time. On this little procedural peculiarity of how we came to something that's either a 2-2 or a 3-2, is it normal for one of the five members of the board to essentially conduct the trial and then not participate in the other four judges' review of his or her initial decision? You know, I can't state that I have perfect knowledge of how the board has been operating since 1980. And I went back and looked through decisions to see what I could find about that. And frankly, it's oftentimes hard to tell from how a decision was written. I mean, it's always the case that there's an initial decision written by one administrative judge, and that if it's appealed, that... And that's the one who actually sees the witnesses live? That's the one who, yes, who sees the witnesses, who, you know, looks at the party's pleadings, looks at the record that's created at summary judgment, and that the remaining judges then rule on it. But what I couldn't tell in all cases by looking at how those decisions were written was exactly what the participation level was. But there is a board regulation that discusses this. It's 4 CFR 27.1, and what it says is that a quorum can act for the board. And here there clearly was a quorum. There were four judges who actively participated in the decision. It was a 2-2 split, and given that the fifth member of the board had already ruled in GAO's favor, that creates a 3-2 decision. Even if it was 2-2 without participation, a tie leaves a... Exactly, and we saw that recently in the Supreme Court Friedrich's case, I believe. You need to wrap up now. Unless there are no more questions, I humbly request that summary judgment be affirmed in GAO's favor. Thank you. Thank you, Your Honors. First, I would like to address this 2-2 tie issue. The board could have articulated a rule to break a tie the way the MSPB did, and in fact, I appreciate the fact GAO counsel pointed this out, that the MSPB has a rule that says if we can't reach a majority, this is how we're going to break a tie. The MSPB could do it. The board never has. Instead, it's trying to backdraft and create something entirely at its whim in this one case. It should have presented a rule. Furthermore, it should have given the administrative judge the opportunity to participate in the decision because all four of the other panel members... Should because you think so? No, Your Honor, because they didn't agree with his conclusions. And if they had pointed out to him his erroneous conclusions and the inferences that he gave... No, no, I meant by should, is there some law or should because you just think so? No, well, I've seen some cases where the complaint was that the administrative judge who issued the summary judgment was the one who went back and did participate with the others. And in that case, frankly, too, they also complained it was a denial of due process. But at least here, I think this judge would have been better educated about the facts and not made the inferences. I do want to point out that with respect to... Your time's up, so you need to wrap up. Okay, thank you, Your Honor. Everything the government is arguing here, the same actor inference, that Rue was the same actor, they're not entitled to that presumption at the summary judgment stage. They're not. And because the board reached that far to interpret the facts in their favor, that means he shouldn't have granted summary judgment. The same thing is true with respect to the goodwill inference. Can't we infer Mr. Brew had goodwill or that the board had goodwill because they let her take the leave without pay? No, no. Anything that would dissuade someone from pursuing a complaint can be considered retaliatory action. Leave without pay meant, yes, she was getting a paycheck, but she didn't have tenure in her position for that time, she did not get her health benefits paid, she didn't get any of the benefits, and she wasn't technically on the rolls or accruing any benefits for that entire year, which is critical, for example, in a RIF. So it was an adverse action. We respectfully request that you find in her favor and at least give her the hearing that she has been seeking for 14 years. Thank you. Thank you, counsel.